or your opponent. With that we'll call the first case of the day in the United States of America v. Cornelius Ty Warren Wilson and others. And Mr. Schweiger, we will hear from you representing Mr. Cornelius Wilson. Good morning, may it please the court. My name is Stan Schweiger and I'm here on behalf of Mr. Cornelius Wilson and I bring two issues before this court. Whether the district court erred in converting the entirety of the powdered cocaine into crack and basically whether he was a leader under the guidelines. And in preparing for this argument today, a quote from a state district or a state appellate judge came to mind and it goes like this, and I'm paraphrasing, words are the tools of the attorney and they must be used with precision. And I believe the lack of precision pervades both findings in this case and I will ask this court to remand this matter for resentencing. And I believe that the lack of precision is no more evident than in the first issue where the district court converted all the powdered cocaine into crack cocaine. And as this court remembers, there were two defendants that the district court used to base its finding on, Kevin Lee and Charles Pickett. Now, in looking at Mr. Pickett's testimony, I believe which the court had to use to base the crack cocaine finding on, to be fair to this court, he mentioned crack cocaine in his testimony. He mentioned he never sold it. He mentioned he never converted the powdered cocaine into crack and he sold only cocaine. And in fact, he mentioned that he only saw powdered cocaine when he would buy the drug from Mr. Wilson. And the lack of precision in this court and that court leads this court to exclude that amount because this court said in United States v. Zuniga, a citation I provided in the letter brief, Your Honor, that if the factual recitation in the PSR lacks sufficient indicia of reliability, it is then error for that district court to base it or consider it sentencing, regardless of whether the defendant objected or offers rebuttal evidence. Now, there's evidence that Cornelius actually cooked some of the cocaine and made crack, right? That's correct, Your Honor. And I believe that deals with Mr. Lee's testimony, but the 8.93 kilograms concerning Mr. Pickett must fall by the wayside. Now, to be fair with the court, that does not get us out of Level 38 because the amounts provided by Mr. Lee still leave us there. But again, we look at the precise and precision used to find those because I think the government's argument in this case is this, that Mr. Lee and Mr. Cornelius Wilson worked together. They talked about crack. They occasionally sold crack together. And he was kind of aware of what was going on with Mr. Lee. But in the Seventh Circuit, the United States v. Edward case states this, that reasonable foreseeability is more than just subjective awareness on that. You have to join in a substantial degree of commitment to the conspiracy's objectives. And in that court's ruling in that same case, they said where you're going to use the entire amount of drugs flowing through a conspiracy and tag the defendant with it, you have to do so when there's been such evidence of such as an admission by that defendant. Let me ask you this. I got the impression that their market was a crack market. That's . . . you know, the buyers that they sold to bought crack and that's the market they were dealing with. And Cornelius, I mean, you know, he should have . . . it would be reasonable to infer that he knew what their market was. I agree with the court on that and agree. I think that's the subjective awareness that is worn against it in Edwards. But also throughout the record, as I cited in my brief, there were several circumstances to where powder cocaine was the target drug being sold. And several of the other offenders testified, I sold powder, I sold powder. There were occasional deals. And in fact, I believe there were hand-to-hand transactions from Mr. Wilson to other defendants selling crack cocaine. But I don't believe that's sufficient to provide an overall finding that all of the drugs sold and attributed to Mr. Wilson should be converted into crack cocaine. Pickett was a lower-level dealer. I mean, he sold . . . is that right? He was supplied . . . he was mainly supplied by Mr. Wilson, as I understand it. Right. So, I mean, do we know that Pickett didn't convert any of that? It's his testimony in the record that stated that he never sold crack or converted cocaine to crack. He only sold cocaine. That was an exact quote from his testimony. There's no evidence to the contrary? I do not recall any, Your Honor, but I can only . . . I don't recall any, Your Honor. And in looking at the Haynes case out of the Eighth Circuit, there they converted it all into crack, but there was a finding that the organization basically had powdered cocaine buried. They ran crack houses. They sold crack out of those crack houses, and the Eighth Circuit found that to be sufficient. Going to my second issue concerning the leadership role, again, here I believe that the government's main claim is that Mr. Wilson was a large dealer, and the Tenth Circuit in May states that's simply not enough. It's not enough that a buy-sell arrangement is sufficient for leadership. It does not demonstrate that he is a manager or organizer of other persons. He is a main supplier, and the Widener case cited in my letter brief states that one who is a main supplier does not make him a leader. And there was inferences in the government's brief that making suggestions to the persons on how to run their business is not sufficient for leadership. And I believe that Mr. Wilson stated that's not the fact, that basically in that case there was an area in the circle the leader or the main distributor was saying, hey, don't cut our stuff, don't do this, and he didn't heed it. He did direct bail, didn't he? Bail was the guy that lived with him and kind of was his go-to boy who did things for him. I guess direction in the terms of basically operational, I don't recall that specific testimony, but . . . He told him to maintain a storage unit to keep his stuff in. He sent some customers to other suppliers. And agreed with that, Your Honor, but the overall circumstance is basically Mr. Wilson was purportedly a pretty large cocaine dealer and had a large network of sub-dealers or people who were buying from him. And simply because he's the front man in that organization does not make him a leader. And that's according to this court's case in Rodding from 1995. He recruited other people, too, didn't he? At least he tried to recruit this guy Skinner. Your Honor, again, I will defer to you on the factual findings. I see my time has expired. Thank you, Mr. Swertman. Mr. Stelarczyk. May it please the Court. My name is Shane Stelarczyk and I represent Christopher Wilson. Although I've raised several issues on appeal, I want to direct the Court's focus to one primary issue regarding the Court's handling of a potential issue of outside taint on the jury. I think the timeline of events is helpful to shedding light on the problems with the way this particular motion for new trial was handled by the trial court. We have two parties exercising the right to a jury trial. It lasts several days and the case is turned over to the jury on a Friday, March 7th. They don't reach a verdict. They're dismissed for the day. Sometime between the end of that recess and Monday the 10th, someone related to the defense made contact with one of the jurors. The morning of the 10th comes about, the prosecutor informs the trial attorneys that this contact occurred. We don't know much more about it at this point. Well, didn't any evidence that the CSO was kind of escorting the jurors to their cars after the Court recessed and somebody yelled out from a distance, we hope our buddy or our brother will get to come home? Wasn't that essentially what it was? Possibly, Your Honor. I can't say for sure because that's what the Court said in response to the co-defendant's motion for new trial after some type of investigation occurred. I mean, that's the only thing we've got in the record, right? Correct. Other than that statement in the order for the co-defendant. But for Christopher Wilson, all we have is that an outside contact occurred. Your complaint is that the District Court did not hold a hearing and investigate that? Yes, Your Honor. Well, not yes and no. In the new trial motion that we filed, we asked for a new trial or any other type of relief that we wanted. Within that request, it would have been afforded to my trial attorney to conduct a further investigation or under this Court's case law, you could also interpret that the Court had its own duty once it became aware of a possible taint to take further action. I've looked through a lot of case law on this. There's no case directly on point. A lot of the cases out there, the trial courts did something. They either What is the suggestion that anything was said other than what Judge Davis just recounted to you? What is in the record that tells us about if anything was said more than what Judge Davis has just stated to you? There's nothing, Your Honor. But what we have to assume under the law, the first threshold, which the Governor's going to point out that we didn't present enough. When did you find out about it? At what point in the trial did you find out that there had been this contact? It appears to be pre-verdict, like on the 10th, and the 10th is when the jury came down with its verdict. So between the 7th and the 10th is when the contact occurred. I think the motion from the trial reflects that on the 10th, the prosecutor approached When were you told about it? I was in trial counsel. When was trial counsel told about it? I believe on the morning of the 10th, sir. And then the jury deliberated and came down with its ruling. We filed our motion. The co-defendant filed a motion for trial on the 13th, three days later. We followed up with a similarly worded motion for trial on the 20th. The next day, the judge handed down its ruling in our case, signing the proposed order prepared by the government that says basically we consider your motion and the government's response motion for new trial denied. Seven days later, the judge issues its ruling in the code. What was your basis of new trial that you filed? Basically that possible taint on the jury. What did you say in the how did you describe that in your motion? I believe the motion says that we learned from the prosecutor that there was some kind of outside contact with someone associated with the defense and that was it. You described it in those conclusory terms but you didn't know that about the statement that somebody just simply yelled when is Johnny coming home or whatever? Yeah, because like I said, the prosecutor felt compelled enough that this contact warranted to the defense counsel so it piqued concern for the prosecution and then the government has not once discussed Let me be more specific. The disclosure to the prosecution and to you was more than simply that there was some contact. It was whether the contact was this exchange. I can't say for sure again, Judge, because we're getting all that information from the new trial order issued by the judge in the co-defendant's case. You say we, but you weren't trial counsel and my question is it's just counterintuitive that the statement is going to be there was some contact with the jury which has an ominous ring to it and something quite different from saying that somebody from the audience whatever made a comment which if anything would be beneficial to the defendant, not to the government. In other words, there was no content to describe in very dry conclusion or terms. There was some contact made when they know what the contact was. The guard knew what it was. He reported it. I mean, the security people did. Right? Again, yes. Well, according to what the court said in that order, but the whole point under this court's case law force, which was cited in the advisory letter, an issue of foreclosing arguments. The court immediately took action dismissed the juror, put in an alternate. However, it didn't make a recording of what conversations occurred between the marshals, between the parties. On appeal, the question was raised by the defendant of whether an impartial or fair jury decided his case. On appeal, this court said the law is clear that a party making a claim that improperly decided their case is entitled to explore that claim. And they used the word must. And what they said is that the facts are not clear on the record. And what you did is remanded to the trial court for further development of the issue. Is that what you want us to do? Remand it back and conduct a hearing as to what was said? Yes, I believe that would be helpful here because this is not your typical case. My client got 360 months. I think we need to be sure about the fact that this was the same juror we're talking about. These are the same contacts we were talking about. Because at this point, we're relying on a ruling issued by the judge after he ruled on our motion for a trial that we are not a part of. The facts were that the security officer heard the comment in the parking lot. And that he reported it to the prosecutor. And that the judge did nothing further about it until he issued an order. Is that what you're saying? Correct. But as to the co-defendant, on ours, we filed our motion raising a claim of potential taint. The next less than 24 hours later, denied. I see that my time is up. Would you like me to? No. That's fine. We have your argument. And thank you. Yes, sir. Thank you. Ms. Embree, you're representing the United States. Good morning. Margaret Embree for the United States. May it please the court. In reference to appellate Christopher Wilson's argument about the jury potential contact, extraneous contact with the jury, the court, as he pointed out, he had filed the motion that the timeline is the jury goes home for the weekend on March the 7th. On March the 10th, they return and return a verdict in the case. On March the 13th, the defendant, Cornelius Wilson, filed a motion for a new trial based on a possibility of potential extraneous contact with the jury. On March 20th, Christopher Wilson files a motion for a new trial. And I think it's important to note that both of these motions, except for the name of the defendant and the charges that they are charged with, are identical motions. Is it customary, therefore, the judge when he receives word that a juror has been contacted in whatever way, not to investigate it other than just accept the word of what happened and let it go at that? Well, I think that would depend on the circumstances. And here . . . What has been your experience? I mean . . . My experience is it depends on whether there's any potential prejudice to the defendant. And here, of course, the statement was more beneficial to the defense than it was to the prosecution. And also whether or not the circumstances warranted any further investigation. I thought that the . . . there's a suggestion in the security officer's account. The person yelled, we hope our brother gets to come home. That's exactly what the court issued in its order. And so apparently the court had received this information and had determined. And it's a question of the court's discretion. You know, what's strange to me is the judge didn't call all the lawyers in and tell them what he had heard. So they'd have a chance to have a little input into what needed to be done. Well, again, I think the comment here was so non-prejudicial and it was de minimis. It was said in passing. Yeah, but I mean, all we know is what the security officer reported that he heard. Beyond that, we don't know what kind of contact was made with that particular juror and why that juror was singled out for the comment or whatever it was. All we know is that the court reduced to writing in its order that a court security officer reported that as the jurors were approaching their vehicles, so it was the jurors in the parking lot, after adjourning on March the 7th, an unknown person shouted the words, we hope our brother gets to go home or come home. And this was not reported to have in any way intimidated or influenced the juror. To the contrary, the court says in its order, it was, if anything, a plea of finding him not guilty. Now, the court doesn't have a duty to investigate conclusory, speculative claims. I think in this court's case of United States v. Smith, which is found at 354 F. 3rd 390, it's a Fifth Circuit case in 2003, this court has held that the district court judge is not required to hold a hearing to investigate further these de minimis contacts. How did the district judge learn of that contact? The court's order says that the defendant asserted that he was told by a prosecutor and then the court says the fact is that a court security officer reported that as the jurors were approaching their vehicles. So that's what we know about. I don't know how the judge learned about that. No. Or what he was told. I assume from what he says that the court security officer reported that someone informed the judge. Yeah, but reported to whom? I thought he reported it to the prosecutor apparently. It's the one that reported it to the attorneys to the defendant. That's not stated in the court's order. I know, but that's what, as I understand, the defendant says now. The defendant says in his motion that he was told in the hallway by the prosecutor that there was Well, counsel, look, it's one thing if the court gets direct information directly of this type and then he judges this is just nonsense and it goes nowhere. That's one thing to judge. But that's not what we're getting. What we're getting is a report to the prosecutor, to one side, who knows, who then somehow or another has ex parte contact with a judge and tells the judge what has been reported and then the judge rules on that basis. I'm sort of reciting what I hear you saying. I don't know if that's accurate. With all due respect, Your Honor, I don't believe that that's accurate. Okay, fine. That's what I'm trying to find out. I think in the defendant's motions, which I said were identical, they say that they learned from a conversation in the hall with a prosecutor that a jury reported to the court. But apparently that's not what happened. Apparently that is something that the defense was reading into whatever comments were made because according to what the court says, he says that he was that the court disputes that in its order. He said the defendant asserts first that he was told by a prosecutor that a juror reported to the court having been approached outside the courtroom. And then the court says, but the fact is a court security officer reported as the jurors were approaching their vehicles. And apparently in my experience . . . All the more reason for some sort of resolution of it because you've got several stories going on here. Well, I think . . . The court disputes this. I mean . . . I guess I would believe the judge. No, I guess you would. And the judge says that the court security officer reported. My experience is court security officers don't report to the prosecutor. They report to the judge. Well, I understand that. And there's nothing improper about any of that. Maybe this is chasing a rabbit down a hole, but the fact of the matter is these guys are going to spend a lot of time in prison and a 15-minute hearing would solve a lot of this. Plus, we don't really want to send signals and messages out there to trial judges that we're backing off one whip. And what we've always said is that when this comes up, Judge Davis sounded very well. None of these three judges are strangers to the trial court. You get the lawyers in. This is what's happening. You talk it out, and then you make a decision. But you don't do it ex parte, and you don't rule without an amendment on how you found out. Well, I believe that this Court's precedent is clear, and that is that it's not necessary that there be a hearing. Based on what? If what? If the underlying information itself is not necessarily a threat to the integrity. And that's what we don't know, because they don't get a chance to talk about that. It's stated that there is no hearing required to investigate merely speculative claims, and that's from the U.S. Peace Committee. We'll have to resolve whether that falls within that precedent or not. If you have other issues in this case, what are the other issues? Let's see. That is the issue that the Defendant Christopher raised, Mr. Stelarczyk raised. According to the issues on drug quantity, the conversion from powder cocaine to crack cocaine, Judge Davis clearly is aware of all the facts, and the factual from the record as a whole. There was overwhelming evidence that the Defendant Cornelius Wilson obtained the supplies from his supplier in Aki in Austin and then distributed it through the Waco area. He was aware that crack cocaine was being converted, that powder cocaine was being converted into crack. Does it matter that you used a one-to-one ratio of conversion? No. I don't believe that that is Well, you did, but there wasn't a one-to-one conversion. I beg your pardon? As I understand the record, the issue here that you're talking about is the foreseeability that the sales were being some of the sales were sold and the quantity sold was being converted to crack cocaine. But then when it comes down to calculating amounts, you do it on a one-to-one ratio, yet the record shows that a lot of it was not being converted. Well, again, I think it's not required that all of it be converted into crack cocaine if it is foreseeable. And here, the Defendant himself converted crack cocaine for sale. He sold crack cocaine. He was present when some of the other people that he supplied converted it into crack cocaine. And as Judge Davis pointed out, his market here was crack cocaine. And I believe that the guideline 2D1.1 and the drug quantity table allows the district court to convert the powder cocaine into a comparable amount that would be a one-to-one ratio of crack cocaine for sentencing purposes if the factual findings support that it was foreseeable. What about this one sub-dealer who said he always dealt in powder? I think still that overall the conversion from one-to-one is permissible here where it's foreseeable that it doesn't have to be all of it, but that some of it is being converted into crack cocaine. And here, the one dealer who says he only dealt in powder cocaine, his portion was small anyway, but the rest of the dealers that are described, like Mr. Lee and others, dealt mostly in the crack cocaine. And again, as you pointed out, that was the market that they were selling to. I'm assuming that the reason that you're not being contested is that you'll reach the same offense level. Yes, correct. And so even if there were some sort of error there, it's harmless because it's within the same guideline range. As to the four-point leadership role that Mr. Schweiger had mentioned, under 3.1.1, his offense level was increased by four levels because of being the leader and organizer. And there were numerous people here that the defendant, Cornelius, involved. Number one was Anthony Bell. Anthony Bell actually lived with Christopher Wilson. But Anthony Bell did things for Cornelius at Cornelius' direction. For example, he moved things for Cornelius. He rented a storage unit Cornelius' name. He put a car that actually was owned and driven by Cornelius in Anthony Bell's name so that it wouldn't trace back to Cornelius. His two girlfriends, Simpson and the woman who was the mother of his children, also testified that they provided a place for him to convert cocaine and went to trips to the supplier with him. And I'm trying to give me just a moment here. Kevin Lee was another defendant who the defendant, Cornelius, would refer some of his customers, like Mr. Skinner, to other minor dealers to purchase crack cocaine. When Mr. Cornelius Wilson didn't have enough available, he would refer them out. Or he'd send them, direct them to other dealers so that they could purchase from them. And he also attempted to recruit Mr. Skinner. He showed Mr. Skinner loads of cash that he had and cocaine and said, you know, we can make a lot of money, you know, trying to invite him in, recruit him in as another dealer. Skinner also had testified at trial that he had observed Cornelius and another participant by the name of Sed cooking crack cocaine and that they then sold it to Skinner. He also supplied others, including his brother Christopher, Shundell West, Charles Pickett, Jamel Singleton, and Anthony Bell. Now does that count when you just sell cocaine to someone else? It wouldn't count just if he was just selling them, but also he would direct his customers to these other people. And then the underlying assumption is that he would tell those people, sell to this guy. And because he would, they would know how much the customer wanted. He was also able to, as I was saying, he like with Skinner and Jamel Singleton, he'd direct them to different people. He would direct Skinner to Jamel Singleton. He also He also supplied the drugs and took a share of the proceeds from his minor dealers, like the people who were his cousins, Mr. Mango and Shundell West. And again, the court relied on information both from the trial and in the PSR about the factual findings to support the leadership role. And the defendant, although he objected to the leadership role, never attempted to rebut any of the information in the PSR or to provide any evidence that showed that information was incorrect. And accordingly, the factual findings should be affirmed. I think also Mr. Christopher Wilson had raised an issue in his brief regarding the possession of the firearm and furtherance of the crime. And the government would rely on its brief to set out the facts that were sufficient to support that. And again, going back to the jury misconduct issue, it is within the court's discretion and that discretion is afforded a great deal of deference on how the court conducts and whether the court conducts an investigation into any potential claim. Here the claim was so speculative and so de minimis that to have called an investigation and to have brought the jurors in and questioned them would have only increased the potential for prejudice here. Are there any other questions from the court that I can . . . ? I think not, Ms. Emory. Thank you very much for your argument. Thank you. Yes, indeed. Mr. Swayga, we'll hear from you now. We have a little time for rebuttal. I guess to return to the drug amount argument first, Your Honor, I want to bring the court's attention, the citations in the record that I provided this court on page 12 that basically show that there's a virtual equal pose between crack and powder sales, that what would happen is that the buyer would take Mr. Wilson would buy powder cocaine exclusively from the connection in Austin that was alleged and basically sell that powder cocaine and whatever happened to it after that it didn't occur to him or didn't matter. And so I would argue that merely with knowledge of the market and matters like that is not reasonably foreseeable. It may be that these folks are going to convert it. It may be, well, that that's the case. But it's the question of whether he joined in that endeavor to make it reasonably foreseeable to it. As to the leadership role, I look at it this way because I hear the same thing that this guy sold a lot of cocaine. And I equate it to myself going to 7-Eleven. If I go to 7-Eleven and buy coffee from a clerk a lot, it doesn't make him a leader. He's not directing me to particular coffee. He's not doing anything other than affording me the opportunity to buy it. And I would assert to this court that's insufficient for the leadership role in this matter. I would assert to this court that there are insufficient findings on both, that the court should remand this matter to the district court for further findings and resentencing in this matter. I appreciate the opportunity to hear from this court today. Thank you, Mr. Swearengin. Thank you, Your Honor. Mr. Zloznik, we'll hear from you. I'll be very brief. I just wanted to point out you hit a nail right on the head when you talked about ex parte communications. This court in Young v. Herring, 938 F2D 543, said when an ex parte communication relates to some aspect of the trial, the judge should disclose the communication to all counsels of the parties. That would have assisted in resolving this matter, but it wasn't done. And my second point is, it's more of a big picture, it's more of a client relationship issue. You have two defendants, yet one defendant gets one treatment, the other gets a totally different treatment, an in-depth order. From a lawyer's perspective, how do you explain that to your client, why you got one ruling and the other guy got something different? It makes it difficult. The judge needs to make sure he treats all defendants equally if they're similarly situated. Thank you. Thank you, sir.